## CHICKASHA COTTON OIL CO. v. RODEN.
### No. 683.

Circuit Court of Appeals, Tenth Circuit.
June 29, 1933.

John H. Miley, of Oklahoma City, Okl. (Alger Melton, of Chickasha, Okl., on the brief), for appellant.

T. Murray Robinson, of Oklahoma City, Okl., and T. M. Robinson, of Altus, Okl., for appellee.

Before COTTERAL and McDERMOTT, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge.

Appellee recovered judgment in the court below for $5,000 as damages on account of the death of Horace Roden, her son, caused as alleged in her complaint by the negligence of appellant. At the conclusion of the evidence appellant moved for a directed verdict in its favor. The motion was denied and exception taken. Later appellant excepted to instructions given the jury by the court and to the refusal of the court to give instructions requested by it. The case is in this court to review these matters.

It appears from the evidence that on the 18th day of November, 1929, Horace Roden was employed by appellant to operate a cotton press in an oil mill owned by it. While so engaged, he was caught in the cotton press and killed. The press consisted of what may be described as an oblong box, open at the bottom, about 9 feet high, 54 inches wide, and 27 inches in depth. The box was divided into two compartments, the plane of division being the floor level of the pressroom; the upper compartment was the press box; the lower compartment was the hopper. One side of the hopper could be opened back about 2 feet at the top. Inside the hopper was what is called a follow block. The follow block could be driven upward and into the press block by hydraulic pressure from a force pump located in an adjacent room. At the side of the press box in the pressroom there was a lever attached to a by-pass valve. By turning this lever in one direction the valve was closed and the pressure of the water from the pump was transmitted through the ram to the follow block; by turning the lever in the opposite direction the valve was opened, the water diverted from the ram and the pressure against the follow block released; by adjusting the lever so that the valve was partly closed and partly open the speed of the follow block, whether up or down, could be controlled. Theoretically the lever might be placed in a position so as to hold the follow block stationary, but in practice such result was not often attained. In

addition to the above manipulations, the follow block could be held stationary at any point in the press by closing the valve and shutting off the pump—the latter was accomplished by shifting the drive belt to the idler.

The duty of the pressman operating this machinery was to compress loose rolls of cotton delivered from the gin into bales such as are seen in commerce. To do this he put rolls of cotton in the hopper, then closed the opening and applied the hydraulic pressure to the follow block; the follow block, moving upward, forced the loose cotton into the press box. This process was repeated usually three times in making a bale. Before or after the last of these operations the pressman spread on the follow block and over its edges the bagging required for covering the lower side of the finished bale. It was while engaged in spreading bagging on the follow block that young Roden was killed. At the time of his death he was about twenty years old. He lived with his mother, and contributed to her support by his labor. He was killed in the afternoon of the first day of his employment as pressman. For about two weeks prior to the day he was killed he had been employed in the mill at other work. During these two weeks he had assisted to some extent the pressman then in charge in the operation of the cotton press. It does not appear that he had ever spread bagging on the follow block prior to the day he himself became pressman. In the afternoon of the first day of his employment in this work, a few minutes before the end of the day shift, he was observed by Mr. Bass, the foreman, in the hopper and spreading bagging on the follow block. Not appearing at the end of the shift, search was made for Roden, and at the suggestion of Mr. Bass, the foreman, the cotton press at which he had been working was examined; the follow block was found to be up and in the press box; when lowered, Roden's body was on it; he was dead.

At the trial it developed that pressmen who had preceded Roden in this work made use of different methods of follow block control while engaged in spreading bagging on the follow block.

J. R. Popchoke, who had previously operated the press, testified that he "shut off the pump and closed the valve and then got in the press and spread the bagging; that by closing the valve and stopping the pump the follow block stood still; that under such circumstances the follow block would neither go up nor go down, unless the crimp was leak-

ing, and in such case the follow block would go down very slowly, so slowly that it wouldn't be noticed."

A. J. Patrick, another pressman, testified that:

"Mr. Bass the day foreman instructed him how to operate the press; * * * that Mr. Bass showed him how to stop the pump; * * * it was accomplished by merely pulling a lever which shifted a belt from the pulley onto the idler; * * * Mr. Bass showed him that if the block was up and the valve was closed and the pump was stopped that the follow block would stand stationary at the place where it was at the time the pump was stopped.

"He was instructed to open the valve and let the follow block down and then while the follow block was at the bottom and the valve open to get in the press and spread the bagging."

He further testified: "That he didn't operate the press at all times in the manner in which Mr. Bass instructed him to operate; that on some occasions he operated the press by breaking the lever open, thus throwing the valve open part way; that in breaking the lever * * * he usually tried to stop the follow block about two feet or two feet and a half below the level of the floor; that he tried to so stop the follow block instead of letting it go onto the bottom as Mr. Bass instructed him to do because sometimes one end of the block would be next to the doors, and at other times he would just be in a hurry."

Dexter Driggers, a former pressman, testified that: "He was instructed as to the manner of operating the press by Jewell Ding the linterman at the mill, who instructed him to operate the press with the valve rather than by cutting off the pump."

In explaining his method of operation he said: "Well, after I got the cotton in, I adjusted it by the lever in the wall on the valve. I adjusted my valve as near right as I could. I took it going down when I put the bagging on."

It seems reasonably certain that young Roden at the time he was killed was using the method of follow block control employed by the witness Driggers and at times by the witness Patrick.

Bass, the foreman, testified: "That shortly before Roden was injured, Roden threw his car keys to another boy who wanted to put his car in the garage wherein Roden's car was left; that the boy to whom Roden had thrown his keys later threw them back to him, the wit-

ness, to be delivered to Roden. That he went in the press room and found Roden down in the press putting the bagging on and handed Roden's keys to him; that he hardly stopped in delivering Roden's keys and did not notice what position the lever was in or whether the pump was on or off, yet he did happen to notice that, at the time, Roden had the block up about two feet from the bottom of the press and was down on one knee and standing on one foot putting one end of the bagging on the block. That later on, Patrick came in and asked the whereabouts of Roden and thereafter the two began to search for him; that while looking around the mill he told Patrick to look in the press; that Patrick found Roden there."

The witness Patrick testified: "That on the evening of the accident and after the time for Roden to quit work for the day and he couldn't be found, he, the witness, and Mr. Bass, began looking around for Roden and passing through the west press, room, Mr. Bass instructed him to look in the single press, stating that Roden might accidentally have been caught in it; that he had not heard a cry. That he supposed he was the first man to reach the press after Roden had been caught in it; that when he reached the press the valve was at least partially closed, the pump was running and the follow block was up. That he opened the valve and let the follow block down to the bottom and Roden's body was on it."

In respect to the hazards incurred in using the split valve method of follow block control, Mr. Stroud, the superintendent of the mill, testified: "That there was danger in getting in the press to spread the bagging on the follow block while the pump was running and the valve was so set as to move the follow block upward and any one could see this danger."

Bass, the foreman, testified: "That at the time he saw Roden in the press, shortly before the accident, he did not notice and did not know whether the pump was stopped and did not observe the position of the valve; that the follow block was not at the bottom of the press and he, the witness, knew this; that he didn't tell Roden not to so operate the press as to spread the bagging while the block was off the bottom, because such was a safe manner of spreading the bagging if Roden had had the pump stopped like he had been instructed; that he, the witness, had no conversation with Roden about stopping the pump."

Patrick testified that:

"About a month and a half or two months after he had first started in the operation of this press, and at the time when he first started to set the valve on neutral he lacked about eight or ten inches from getting caught in the press. That it was difficult to set the lever so that the valve would be neutral thereby causing the follow block to stand still. That after the time when he almost got caught in the press he was more careful to see that the valve was set on neutral so that the follow block would not move upward while he was in the press spreading the bagging. That sometimes he operated the follow block in spreading his bagging by cutting off the pump and at other times he operated it by the valve lever."

"That sometimes in operating the block, he gradually closed the valve when the block reached the desired point with the idea that the block would go down very slowly and then he got in the press and spread the bagging. * * * That on one occasion he misjudged the location of the lever whereby it was so set that the block moved upward instead of downward while he was in the press spreading the bagging; that he spread the bagging and got out of the press without getting caught in it. That he then discovered that it was risky to so operate the press. * * * That he, the witness, had realized that operating the press by trying to manipulate the valve so as to hold the block stationary with the pump running was a dangerous method of operation. That while he was in the press spreading the bagging he could tell whether the block was moving up or down and that by paying attention to what was happening, if he was down near the bottom of the press and felt the block moving upward he could certainly get out. That after the time when he almost got caught in the press he so manipulated the lever which controlled the valve, that the follow block never moved upward while he was spreading the bagging."

The witness Driggers, in connection with his testimony quoted above, said that in adjusting the valve the block would sometimes be coming up instead of going down as intended, and in reply to the question: "You had to get back out of the press at what time in the operation," he answered: "Well, I don't know exactly; if the block happened to be coming up I had to get out pretty quick. * * * A time or two I didn't get it set exactly right; it was coming up."

In respect to instructions given Roden as to the methods of follow block control, Bass,

the foreman, testified: "He (Roden) didn't seem to need instruction; he worked in there with A. J. Patrick and learned it and I thought that was enough."

Patrick testified: "That during the last week or two of the time during which he operated the press on the day shift, Roden was employed as a sweeper and at various times assisted him" in operating the press. That during that time "he showed Roden how to operate the press in practically the same manner that Mr. Bass instructed him. That he did not think he showed Roden how to stop the follow block at a desired point by closing the valve and stopping the pump, because he, the witness, always spread the bagging while the follow block was at the bottom of the press with the valve opened; that he told Roden what the effect would be of getting in the press with the valve closed, or partly closed, and the pump running; that he told Roden that a man who spread the bagging in such a way did it at his own risk."

It was alleged in the complaint: "That the said press in which the said deceased was killed was an old and antiquated type of press and was dangerous and unsafe to operate. That the machinery of said press and especially the hydraulic pump which operated the same was worn and defective, and because of such defect the operation of said press was dangerous and unsafe."

Following a description of the press and the manner of its operation, it was alleged:

"That it was difficult or almost impossible to place the bagging on this block when it was completely lowered to the bottom of the press and it was the custom and usual manner of operating the press for the operator to start the hydraulic pump after the block had been lowered to the bottom of the press, and while the block was being raised to the level of the floor, to get into the press and place the bagging thereon and then climb out through the opening at the side before the block had reached the level of the floor. When the pump was started the block would raise from the bottom of the press to the level of the floor in something like one to two minutes, so that it required extremely quick action to place the bagging in its proper position on the block and then crawl out through said opening on the side before the press reached the floor level or before it got high enough to make the opening so small that the operator could not crawl out through said opening on the side of the press; that because of the defective and leaky condition of the pump, the press block could not be partly raised and

then stopped for the reason that due to the leak the block would immediately go down, and therefore it was necessary and customary to operate this press in the manner hereinbefore set out, and plaintiff alleges that while the deceased was placing the bagging on the block as hereinbefore alleged, that the block came up so fast and so quickly that the deceased was unable to crawl out through the opening on the side of the press, and that the block caught the deceased in the press and pressed him up and against the bale of cotton, which was in the upper part of the press, crushing him to death."

"Plaintiff further alleges that the deceased was inexperienced in the operation of said press, this being the first day on which he had operated the same, and that the hazards and dangers in the operation of the press were not explained to the deceased by the foreman of the plant or any one familiar with the operation of the press, and that such dangers and hazards were not known or apparent to the deceased, and that the deceased came to his death by reason of such negligence of the defendant, and by reason of the defendant's failure to provide and furnish the deceased with reasonably safe machinery or appliances with which to do his work."

At the close of the evidence at the trial in the court below, it is evident there was a substantial variance between the allegations of the complaint and the proofs. Neither the allegation respecting the method of follow block control when spreading the bagging, nor the alleged physical reasons for such method, were sustained by the evidence. The evidence shows altogether different methods of follow block control, and for different reasons. Nor is the allegation that Roden was killed because "the block came up so fast and so quickly that the deceased was unable to crawl out through the opening on the side of the press" in accord with the reasonable and fair inferences to be drawn from the testimony of the witnesses. It is quite evident from this testimony that Roden either did not notice that the follow block was moving up, or, if he did notice it, he must have miscalculated its speed or failed to observe the height attained by it in the hopper until too late.

Appellant in the court below did not raise the question of variance, nor has it done so in this court, but, on the contrary in its motion for a directed verdict, the reasons given for such action were, first, "the facts proven are wholly insufficient to show any negligence on the part of the defendant"; second, "the proximate cause of the accident

* * * was the method in which the deceased operated the press"; and, third, "the risk of operating it in the way he did was open, obvious and patent so as to be readily observed by the reasonable use of his senses, having in view his age, intelligence and experience." While not raised, the matter of the variance is adverted to because suggesting the standpoint from which the case should be considered and determined.

The Supreme Court of the United States in Wasatch Mining Company v. Crescent Mining Company, 148 U. S. at page 300, 13 S. Ct. 600, 602, 37 L. Ed. 454, quoted with approval from a New York case (Tyng v. Warehouse Co., 58 N. Y. 308, 313) as follows: "No question appears to have been made during the trial in respect to the production of evidence founded on any notion of variance or insufficiency of allegation on the part of the plaintiff. Had any such objection been made it might have been obviated by amendment in some form or upon some terms under the ample powers of amendment conferred by the Code of Procedure. It would therefore be highly unjust, as well as unsupported by authority, to shut out from consideration the case as proved, by reason of defects in the statements of the complainant. Indeed, it is difficult to conceive of a case in which, after a trial and decision of the controversy, as appearing on the proofs, when no question has been made during the trial in respect to their relevancy under the pleadings, it would be the duty of a court, or within its rightful authority, to deprive the party of his recovery on the ground of incompleteness or imperfection of the pleadings."

In Standard Oil Company v. Brown, 218 U. S. at page 81, 30 S. Ct. 669, 670, 54 L. Ed. 939, the court said: "The assignments of error are based on certain instructions asked by the company which the trial court refused to give, the chief of which requested the court to direct the jury to find a verdict for the company upon the following grounds: (1) There was a fatal variance between the pleadings and the proof. * * * "

In discussing this assignment the court said: "The rule is familiar and elementary that the pleadings and proof must correspond, but a rigid exactitude is not required. In Nash v. Towne, 5 Wall. 689, 698, 18 L. Ed. 527, 528, it is said that modern decisions in regard to the correspondence between the pleadings and the proof are more liberal and reasonable than former ones, and states the rule to be by statute in the Federal courts 'to give judgment according to law and the right of the cause.' It was observed that it is the established 'general rule in the state tribunals that no variance between the allegations of a pleading and the proofs offered to sustain it shall be deemed material, unless it be of a character to mislead the opposite party in maintaining his action or defense on the merits.' The final comment of the court is that irrespective of those statutes, however, no variance ought ever to be regarded as material where the allegation and proof substantially correspond. See also Liverpool & London & Globe Ins. Co. v. Gunther, 116 U. S. 113, 6 S. Ct. 306, 29 L. Ed. 575; B. & P. R. R. Co. v. Cumberland, 176 U. S. 232, 238, 20 S. Ct. 380, 44 L. Ed. 447, 451."

In Roberts v. Graham, 6 Wall. 578, 581, 18 L. Ed. 791, the court stated the rule in this language: "The objection of variance not taken at the trial, cannot avail the defendant as an error in the higher court, if it could have been obviated in the court below."

It is manifest from these decisions that it is the duty of this court to review the rulings and instructions of the trial court in this case in the light of the evidence rather than in respect to the allegations of the complaint which are at variance with the evidence. And it was from this standpoint that the trial court submitted the case to the jury.

In the instructions to the jury the trial court first summarized the substance of the pleadings and then described in a general way the press and the means and manner of its operation; continuing, the court briefly stated what the evidence showed or disclosed, and finally stated as the issue in the case "whether or not the press as operated constituted a dangerous instrumentality is a matter for determination by the jury." Following this limitation of the issues, and in harmony with the last paragraph of the complaint quoted above, the court fully and fairly explained to the jury under what circumstances it becomes the duty of a master operating a dangerous instrumentality to warn its servant of the dangers incident to his employment, and under what circumstances such duty is not imposed; and in like manner explained to the jury under what circumstances the servant would assume the risk or be guilty of contributory negligence.

A great number of exceptions were taken to the instructions by appellant, too numerous to be set out and commented upon in detail. It will be sufficient for our purpose to deal with them in groups. In one group appellant objected to the summary of the pleadings made by the court, without, however,

pointing out any misstatement of the court respecting them. In another group appellant excepted to the summary of the evidence made by the court. These exceptions we shall advert to shortly. In another group appellant excepted to the instructions given by the court respecting the duty of the master and of the employee. These exceptions are so clearly without merit that they will not be again mentioned. In another group appellant excepted to the instruction given by the court in respect to damages. Appellant likewise tendered many requests for instruction; some of these were given, others refused. Only one of the refused requests, aside from the request for a directed verdict, is of sufficient merit to require notice.

■ Adverting now to the exceptions of appellant to the court's summary of the evidence in his instructions to the jury. One of these exceptions was in this language: "The defendant excepts to so much of Instruction Number Three, detailing the facts in the case, as states in substance that the evidence shows that the only instruction received by the deceased as to the operation of the press and the dangers thereof was from a young man whom he succeeded and who was then working the night shift, in that the instruction fails to take account of what he may have learned by observation and which a person of ordinary care and prudence under the same or similar circumstances and of his age and experience would have learned by observation."

It is sufficient to say that the matter which the instruction in question failed "to take account of" was fully covered by other instructions of the court given of its own motion or at the request of appellant in respect to assumption of risk and contributory negligence. The other of these exceptions was: "Defendant excepts to so much of Instruction Number Three, as states in substance, that there is a conflict in the testimony as to whether or not the press was unsafe and dangerous to operate, and that such matter was for the determination of the jury."

■ Clearly this exception was intended to challenge the sufficiency of the evidence to take the case to the jury, but it is assigned and discussed by appellant in its brief as referring to a misstatement by the court in respect to the testimony of the witness Kemp—a matter not raised by the exception, and for that reason it is disregarded.

Appellant's exception to the trial court's instruction as to damages was in this language: "The defendant excepts to Instruction Number Eighteen, as given and read to the jury, on the measure of damages for the reason that it permits the jury to award damages for any earnings or loss of support of the deceased after attaining his majority."

This exception, though not very intelligible, was evidently intended to challenge the right of the mother to recover any damages at all on account of contributions for her support that her son might have made after his majority had he not been killed. In the assignment of errors and in the brief this instruction is set out in part. The argument respecting the instruction based upon the above-quoted exception contains this paragraph: "The instruction in this case permits recovery for what support the *plaintiff might have reasonably expected of the deceased during her life*. The rule of the Oklahoma cases is what the jury might reasonably conclude from the circumstances the deceased would contribute to the support of the parent after his majority. A parent might expect a great deal more than others would conclude from the circumstances that the child would contribute after majority." (Appellant's italics.)

The clause "what support the plaintiff might have reasonably expected of the deceased during her life" is a part of the closing sentence of the first paragraph of the instruction, in these words: "If you find for the plaintiff you may take into consideration what support she might have reasonably expected from the deceased during her life." It will be noted that the second sentence in the paragraph quoted from the brief expressly abandons the point of appellant's exception. That sentence reads: "The rule of the Oklahoma cases is what the jury might reasonably conclude from the circumstances the deceased would contribute to the support of the parent after his majority." The criticism in the brief of the court's instruction is that: "A parent might expect a great deal more than others would conclude from the circumstances that the child would contribute after majority." Not only is this criticism a departure from the exception taken at the trial, it misrepresents the instruction. The instruction contains the words "might have reasonably expected," while the criticism contains only the words "might expect." Of course, a parent might expect a great deal more than others would conclude, but it is difficult to see how she might reasonably expect a great deal more than others would reasonably conclude. Undoubtedly the instruction in question gave the jury an indirect, roundabout rule for determining their verdict. The direct question for

their determination was, not what she might have reasonably expected, but what the jury might reasonably find from the circumstances the deceased would have contributed for her support after his majority had he not been killed, reduced, of course, to present worth. This question, however, was not the one raised by appellant's exception, and further discussion of the subject is therefore unnecessary.

■ The refused request, aside from the one for a directed verdict, was: "That there is no evidence reasonably tending to support the allegations of plaintiff's petition that the defendant was negligent in that the machinery of the press in which Horace Roden was injured and the hydraulic pump which operated the same was worn and defective, rendering the operation of the press dangerous and unsafe, and you will therefore disregard such allegation of negligence in the consideration of this case."

There was no substantial evidence in the record tending to prove that the press was of an old and antiquated type or that the machinery of the press or the hydraulic pump which operated it was worn or defective, and, this being true, it follows that there was nothing in the record tending to prove that the press was dangerous and unsafe to operate because it was old and antiquated, or that the operation of the press was dangerous and unsafe because the pump or other machinery was worn or defective, or "that because of the defective and leaky condition of the pump, the press block could not be partly raised and then stopped for the reason that due to the leak the block would immediately go down, and therefore it was necessary and customary to operate this press in the manner hereinbefore set out."

The trial court gave similar requests withdrawing from the consideration of the jury the other allegations of the complaint referred to above. Having done so, it might as well have adopted this one also. But, in view of the limitation of the issues to the one question "as to whether or not the press as operated constituted a dangerous instrumentality" under the evidence, appellant was not prejudiced by the refusal of the court to give the requested instruction. As the case developed and was submitted, there was no reason requiring the court to specifically withdraw from the consideration of the jury the unproven allegations of the complaint. All of them involving the negligence of appellant were unproven—hence the variance, and the submission of the case on the evidence. The fact that the trial court was complaisant and gave two of appellant's requests of similar import would not and could not make the refusal to give the third one prejudicial error.

■ The serious question in the case is whether the trial court erred in refusing to direct a verdict in favor of appellant at the close of the evidence. It was alleged in the complaint: "That the deceased was inexperienced in the operation of said press, this being the first day on which he had operated the same, and that the hazards and dangers in the operation of the press were not explained to the deceased by the foreman of the plant or any one familiar with the operation of the press, and that such dangers and hazards were not known or apparent to the deceased, and that the deceased came to his death by reason of such negligence of the defendant."

The motion of appellant for a directed verdict was predicated upon these allegations of the complaint, and it was in respect to these allegations of the complaint that the motion was denied and the case submitted to the jury upon the evidence as to whether or not the press as operated constituted a dangerous instrumentality. The words "as operated" used in the instruction of the trial court had reference to the method of follow block control when the pressman, and Roden in particular, was engaged in spreading the bagging. The testimony of the witnesses shows that the method being used by Roden had been theretofore in common use; that its use was attended by some hazard; that Roden had not been instructed not to use this method by his superiors; that the only instructions he had received were from Patrick, a fellow employee, who himself had been using this method at times; that Roden was young and inexperienced.

In view of this state of the record, the trial court committed no error in submitting the case to the jury.

Affirmed.

Judge COTTERAL in his conference memorandum favored the affirmance of this judgment. He died April 22, 1933.